1
2
3
4
5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8    CAROLYN M. DIXON,                          No. C-07-03370 JCS

9              Plaintiff,                       **ORDER DENYING PLAINTIFF'S**
                                                **MOTION FOR SUMMARY JUDGMENT**
10         v.                                   **AND GRANTING DEFENDANT'S**
                                                **MOTION FOR SUMMARY JUDGMENT**
11   MICHAEL J. ASTRUE, COMMISSIONER            **[Docket Nos. 18, 19]**
     OF SOCIAL SECURITY,
12
               Defendant.
13   _____/

14

15   **I.    INTRODUCTION**

16         On February 3, 2004, Plaintiff Carolyn M. Dixon filed an application for Disability

17   Insurance benefits under Title II of the Social Security Act ("SSA"), with an alleged onset date of

18   January 31, 2004.  The application was denied initially and upon reconsideration and Plaintiff

19   requested a hearing before an administrative law judge ("ALJ").  The ALJ rendered an unfavorable

20   decision, which became the final decision of the Commissioner of the Social Security

21   Administration ("Commissioner") when the Appeals Council denied Plaintiff's request for review,

22   on April 27, 2007.  On June 27, 2007,  Plaintiff filed a complaint seeking review of the

23   Commissioner's decision, asking the Court to reverse the Commissioner's denial of benefits and

24   remand with instructions to award benefits or, in the alternative, to remand for additional

25   administrative proceedings.

26         Plaintiff filed a motion for summary judgment pursuant to 42 U.S.C. § 405(g).  The

27   Commissioner responded with a cross-motion for summary judgment.  The parties have consented to

28   the jurisdiction of the undersigned magistrate judge, pursuant to 28 U.S.C. § 636(c).  For the reasons

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

stated below, Plaintiff's motion is DENIED.  Defendant's motion is GRANTED.

## II.     BACKGROUND

### A.     Plaintiff's Background

Plaintiff was born on December 26, 1951 and was 52 years old at her alleged onset date. Administrative Record ("AR") at 73.  Plaintiff completed high school and three years of college. AR at 88.   From 1995 to 2001, she worked as a receptionist in a retirement home.  AR at 83. Before that, she was employed as a warehouse worker and a wire transfer clerk.  *Id*.  On January 31, 2001, Plaintiff gave up her job as a receptionist due to her impairments, including problems with her knees and frequent asthma attacks.  *Id*.

### B.     Plaintiff's Medical History

Plaintiff alleges the following impairments: sarcoidosis/asthma, obesity, degenerative joint disease in the bilateral knees (left greater than right), carpal tunnel syndrome in both hands, irritable bowel syndrome, Graves disease, right shoulder bursitis, and anxiety with phobias.  AR at 17.  The ALJ found that Plaintiff's sarcoidosis/asthma, right carpel tunnel syndrome[1] and degenerative joint disease in the bilateral knees were severe impairments while the remaining impairments were not severe.  *Id*.  Because Plaintiff does not challenge these findings, the Court sets forth below only the medical evidence as to the impairments the ALJ found to be severe.

#### 1.     Asthma

The reports from Alameda County Medical Center concerning Plaintiff's treatment for her lung problems date back to January 1, 2003.  AR at 195 (doctor report dated January 1, 2003 indicating Plaintiff was examined in connection with symptoms of asthma, cough, earache and nasal drainage).  On a February 4, 2003 hospital visit, the doctor wrote that Plaintiff had experienced "further asthma attacks" but concluded that she was doing well overall.  AR at 189.  The doctor also noted that Plaintiff had missed a stress test on January 9, 2003.  *Id*.  Plaintiff also missed two chest

---

[1]Although the ALJ stated in his decision that Plaintiff's right carpal tunnel syndrome both was and was not a severe impairment, *see* AR 17, he went on to consider Plaintiff's right carpal tunnel syndrome in determining Plaintiff's residual functional capacity.  Therefore, the court concludes that the ALJ did find  Plaintiff's right carpal tunnel syndrome to be a severe impairment.

United States District Court

For the Northern District of California

1  diagnostics later that year, one in April and one in May, as well as an appointment at the pulmonary

2  clinic in July 2003.  AR at 191-92.

3      The record shows that Plaintiff was treated for asthma at Kaiser during the period between

4  October 28, 2003 and November 23, 2005.  AR at 221, 290.  Plaintiff often had symptoms such as

5  coughing, wheezing, and mucus.  AR at 252, 261, 305, 330, 349.  During June through November of

6  2004, she had numerous consultations with Joy Leong, an adult asthma care manager, for periodic

7  flare-ups of her asthma.  Ms. Leong prescribed the anti-inflammatory Advair and the use of a

8  nebulizer, and on some occasions, the use of a metered dose inhaler.  AR at 243-44, 252, 258-62.  In

9  September of 2004, Plaintiff was diagnosed with acute asthma exacerbation, though it began to

10 improve the following month and was resolved by November.  AR at 325, 330, 343-44, 349.  On

11 two occasions, Ms. Leong noted that Plaintiff had not adhered to her recommended prescription of

12 medication, and on another visit, she noted that while Plaintiff was adhering to her recommended

13 prescription, she was using less than the recommended dosage.  AR at 252, 258, 260.  Ms. Leong

14 concluded in a progress note that Plaintiff had poor self-care skills and poor symptom management.

15 AR at 261, 340-41.  On a November 2, 2005 visit, Ms. Leong wrote that Plaintiff's acute asthma

16 exacerbation was worsening.  AR at 291.  Ms. Leong again diagnosed Plaintiff with acute asthma

17 exacerbation on a November 23, 2005 visit.  AR at 290.

18          **2.      Knee Pain**

19      The earliest evidence in the record relating to Plaintiff's left knee pain is a report from a

20 March 4, 2003 appointment at the Alameda County Medical Center.  AR at 186.  The doctor noted

21 that Plaintiff "has knee pain in her left knee on a persistent basis" but found that she had a full range

22 of motion.  *Id.*  The doctor also scheduled Plaintiff to have an X-ray taken of both knees for the

23 following day, and for a re-evaluation to be done on March 11, 2003.  *Id.*  Subsequently, Plaintiff

24 missed an appointment scheduled for April 1, 2003. *Id.*  At Kaiser, Dr. Richard Aptaker gave

25 Plaintiff an injection for her knee pain in June 2004, although in March 2004, Dr. Jones had written

26 that her joint pain was resolved.  AR at 213-17.  Dr. Jones also noted that a previous knee injection

27 had a good result.  AR at 214.  In September 2004, Dr. Salamacha wrote that Plaintiff had been

28 feeling better after a series of knee injections.  AR at 245.  However, clinical abnormalities were

United States District Court
For the Northern District of California

1   found in an August 2004 hospital visit, including mild osteophytes in the medial knee joints

2   bilaterally and a mild narrowing of the medial knee joint space.  AR at 268, 351.

3          On November 11, 2004, Plaintiff had another appointment concerning her knee, where Dr.

4   Guenther Knoblich noted that her previous injections had not helped much and that she had clicking,

5   popping, and locking episodes; the doctor diagnosed her with degenerative joint disease and

6   recommended degenerative knee arthroscopy.  AR at 326.  On December 7, 2004, Dr. Knoblich

7   performed knee arthroscopy on Plaintiff.  AR at 311.  Dr. Knoblich performed a follow-up

8   examination in July 2005.  AR at 300.  He reported that a McMurray's test used to find tears in the

9   miniscus of the knee came back negative and the portals were well-healed with no indication of

10  Tinel's.  AR at 300.  Apart from some medial joint line tenderness, he found no other abnormalities.

11  AR at 300.  Dr. Knoblich diagnosed Plaintiff with knee arthritis and recommended  full conservative

12  treatment before considering further surgery.  AR at 300.  Plaintiff agreed with Dr. Knoblich's plan

13  of treatment.  AR at 300.  On an October 18, 2005 hospital visit, Plaintiff again complained of knee

14  pain.  AR at 297.

15         Plaintiff states in her Motion that on May 9, 2006 – after the two hearings on Plaintiff's

16  claim but before the ALJ issued his decision finding Plaintiff was not disabled –  Dr. Knoblich

17  performed total knee replacement surgery.

18                    **3.        Right Carpal Tunnel Syndrome**

19         Plaintiff's carpal tunnel syndrome is mentioned in the clinical notes from three hospital

20  visits.  On an August 2, 2004 doctor's appointment, Dr. Marcia Li, of Kaiser, noted that Plaintiff had

21  carpal tunnel symptoms, but that she had never been evaluated for Carpal tunnel syndrome.  AR at

22  256.  Subsequently, Plaintiff underwent a motor nerve conduction study on August 27, 2004 and

23  Robyn Reince, RN, diagnosed her with "very mild right carpal tunnel syndrome as evidenced by

24  slightly prolonged median motor distal latency and slightly prolonged transcarpal sensory latency."

25  AR at 249.  Reince prescribed a treatment plan for Plaintiff that included wearing wrist splints at

26  night and taking vitamin B6 at a dosage of 150 mg./day.  AR at 247.  The risks and benefits of

27  conservative treatment as compared to surgical treatment were also discussed.  *Id*. Plaintiff had a

28  follow-up appointment on November 4, 2004.  AR at 335.  Reince found that Plaintiff still had mild

1   right carpal tunnel syndrome but noted that Plaintiff reported a "significant decrease in subjective

2   symptoms." *Id*. Accordingly, Reince advised a reduction in the daily dosage of vitamin B6 to 50

3   mg. *Id*.

**4.     Obesity**

5   The medical record does not address Plaintiff's obesity in detail. Various doctors have noted

6   Plaintiff's obesity. AR at 204, 223, 297, 310. Dr. Li, on an October 18, 2005 hospital visit advised

7   that Plaintiff exercise and keep track of her calorie intake. AR at 297.

**5.     State Agency Internal Medicine Evaluation by Dr. Momi**

9   Plaintiff underwent a comprehensive internal medicine evaluation at the request of the

10  Department of Disability Services ("DDS"), performed by state agency physician Dr. Jaskaran

11  Momi, on April 19, 2004. AR at 19, 202-206. In his report, Dr. Momi began by giving a patient

12  history. The information in this section apparently was reported to Dr. Momi by Plaintiff as Dr.

13  Momi states at the beginning of the report that he did not have "any medical records available." AR

14  at 202. Concerning Plaintiff's sarcoidosis, Dr. Momi stated that Plaintiff was on three different

15  inhalers and a nebulizer, that she claimed to get short of breath after walking for a block, and that

16  her symptoms increased with exposure to chemicals, fumes, and dust. AR at 202. Concerning

17  Plaintiff's arthritis in her knees, Dr. Momi wrote that she had pain in her knees daily and occasional

18  pain in her feet, that she had been given pain medication and cortisol injections that had helped with

19  the symptoms somewhat, and that the pain was worse when getting up after a short rest and in the

20  morning. AR at 202-03. A pulmonary function test was performed in conjunction with the

21  evaluation, and the technician wrote that "post testing was not performed due to normal findings."

22  AR at 207. Dr. Momi diagnosed Plaintiff with sarcoidosis, arthritis in both knee joints, possibly

23  degenerative joint disease, with some pain on extremes of flexion in both knee joints,

24  hypothyroidism, irritable bowel syndrome, and obesity. AR at 206. Based on the findings of the

25  examination, Dr. Momi gave a functional assessment, concluding that Plaintiff had no limitations on

26  sitting, reaching, bending and stooping, handling, fingering, gripping, and feeling, that she could

27  stand and walk for about forty minutes at a time for a total of five to six hours out of an eight-hour

28

**United States District Court**
For the Northern District of California

5

United States District Court
For the Northern District of California

1  workday, that she should avoid working in a place with chemicals and extreme temperatures, and

2  that she could carry ten pounds frequently and twenty pounds occasionally. *Id*.

3                    **6.    Psychiatric Evaluation by Dr. Johnston**

4       On November 5, 2004, Dr. Bruce Johnston performed a psychiatric evaluation on Plaintiff at

5  the request of the Social Security Administration, for the purpose of disability evaluation. AR at

6  280. He found Plaintiff to be warm, friendly, and nicely groomed. AR at 280-81. She had no

7  difficulty answering mental status questions. AR at 281. Dr. Johnston wrote that while Plaintiff

8  showed elements of phobia and mood problems, her main problems were her knee pain and

9  sarcoidosis. AR at 281-82. The psychiatrist noted that Plaintiff had to leave her job as a

10 receptionist at a retirement home because of her bilateral degenerative knee joint disease, which

11 prevented her from climbing the small riser to get to her desk; he also noted that her ability to do

12 heavy housework, cleaning, and lifting had been declining. AR at 280-81. In addition, Plaintiff's

13 breathing problems were evident to Dr. Johnston, as climbing the seventeen steps to his office

14 appeared to have left her short of breath and her breathing did not improve during the examination.

15 AR at 281. Dr Johnston concluded by stating that Plaintiff's future depends on how her sarcoidosis

16 develops, which he speculated would likely be negatively affected by the inactivity necessary in

17 recovering from knee surgery. AR at 282.

18                    **7.    Physical Residual Functional Capacity Assessment**

19      The record contains one physical residual functional capacity ("RFC") assessment dated May

20 19, 2004, completed by Dr. LolaLee VanCompernolle. AR at 277. The assessment finds that

21 Plaintiff is subject to the following exertional limitations: occasionally lift and/or carry up to twenty

22 pounds, frequently lift and/or carry up to ten pounds, stand and or walk (with normal breaks) for a

23 total of about six hours in an eight-hour workday, and sit (with normal breaks) for a total of about

24 six hours in an eight-hour workday. AR at 271. Under "Postural Limitations," the boxes indicating

25 climbing ramp/stairs, balancing, stooping, kneeling, crouching, and crawling were marked as

26 "frequently," and the box for climbing a ladder was marked "occasionally." AR at 272. The doctor

27 did not find any manipulative, visual, or communicative limitations. AR at 273-74. As for

28 environmental limitations, the doctor found that Plaintiff should avoid concentrated exposure to

**United States District Court**
For the Northern District of California

1   fumes, odors, dusts, gases, and poor ventilation. AR at 274. On the same date, Dr. Camille

2   Williams reviewed all of the evidence in the file and affirmed Dr. VanCompernolle's assessment.

3   AR at 277.

4   In the accompanying consultation request, also dated May 19, 2004, Dr. VanCompernolle

5   noted that an X-ray of Plaintiff's left knee showed mild medial degenerative changes. AR at 278.

6   The doctor observed that Plaintiff's back showed a normal curve with no tenderness and that she

7   experienced pain in both knee joints on extremes of movement with minimal crepitus. *Id*. Dr.

8   VanCompernolle noted that Plaintiff's allegations and symptoms seemed credible. AR at 279.

9   **C.    Plaintiff's Daily Activities Questionnaire**

10  The record contains one Daily Activity Questionnaire, dated August 6, 2004. AR at 119-

11  126. In it, Plaintiff stated that her daily activities included washing up in the bathroom, making her

12  bed, preparing breakfast, watching television or checking her e-mail, preparing dinner, and seeing

13  her asthma therapist every Monday. AR at 119. She also babysat her four-year-old grandson and

14  administered his asthma medicine. AR at 120. As for her personal care, she wrote that with the

15  exception of tying her shoes and doing her hair, she could dress, bathe, feed herself and use the toilet

16  without any problems. *Id*. Plaintiff stated that before her illness she had better mobility in her legs,

17  could move faster without pain, and breathed better. *Id*. About five times a week, Plaintiff prepared

18  complete meals with several courses, which took her from half an hour to two hours. AR at 121.

19  Plaintiff also performed light cleaning without using chemicals and did the laundry, which took her

20  about two to three hours each time. *Id*. Plaintiff reported that she did not need "help or reminders

21  taking medicine." *Id*. She went outside about every other day; every other week for an hour

22  Plaintiff shopped for food and, when needed, clothing. AR at 122. Three times or more per week,

23  Plaintiff talked on the phone and had visitors over. AR at 123. She also went to church with her

24  husband or her daughters. *Id*. As for her physical abilities, Plaintiff wrote that she could walk for

25  only one block before needing to rest, and her illnesses affected her ability to squat, bend, stand,

26  walk, sit, kneel, climb steps, and complete tasks. AR at 124. Plaintiff stated that she did not handle

27  changes in routine or stress well. AR at 125. She also noted that she had to wear a wrist brace for

28  her carpal tunnel syndrome. AR at 125.

United States District Court
For the Northern District of California

1

    **D.    Function Report by Plaintiff's Husband**

2           Plaintiff's husband completed a form entitled "Function Report - Adult - Third Party," dated

3    August 6, 2004.  AR at 127-135.  His comments were similar in substance to those of his wife.  On

4    the form, Plaintiff's husband stated, in relevant part, the following: due to her illness, Plaintiff had

5    problems dressing, doing her hair, walking for long periods, and standing; she could not sleep for

6    more than two hours; Plaintiff ventured out daily, either by walking, riding in a car, or using public

7    transportation; due to her illnesses, Plaintiff had trouble kneeling, climbing stairs, concentrating, and

8    lifting; Plaintiff prepared complete meals with several courses three or four times weekly, though

9    after her illness, it took longer to prepare meals; Plaintiff cleaned daily for two hours, and when

10   needed did the laundry, which took her four hours, and ironing, which took her two hours.  AR at

11   128-132.  Contrary to Plaintiff's report, her husband stated that he had to remind her to take her

12   medicine and to take care of personal needs.  AR at 129. He also noted that Plaintiff could be

13   moody, fussy, and forgetful.  AR at 127.

14   **E.    The Administrative Hearing**

15          The ALJ held an administrative hearing on Plaintiff's claim for disability insurance benefits

16   on January 11, 2006.  Present at the hearing were Plaintiff, her attorney, Harvey Sackett, and a

17   vocational expert ("VE"), Jeff Malmuth.  AR at 361.  The hearing opened with Sackett presenting a

18   synopsis of Plaintiff's past relevant work and of her medical history, concluding that given

19   Plaintiff's combination of impairments, she would not be able to perform even sedentary work on a

20   regular basis.  AR at 362-64.  Because of a pulmonary function test which stated that Plaintiff

21   smoked, the ALJ went on to clarify whether or not Plaintiff did, in fact, smoke, as smoking would

22   negatively impact her respiratory illnesses.  AR at 367.  It was established that Plaintiff did not

23   smoke but that members of her household smoked.  AR at 370.

24          Plaintiff then testified about her physical limitations.  She stated that she could sit for about

25   twenty to thirty minutes at a time before her back started to hurt and she needed to change positions

26   and stretch for about ten minutes.  AR at 375.  She testified that in an eight-hour work day, she could

27   alternate between sitting and standing for a total of about one hour.  AR at 378.  Plaintiff stated that

28

                                                    8

**United States District Court**
For the Northern District of California

1    due to knee and back pain, she now walked with a cane and at a slower pace than before.  AR at 379.

2    Furthermore, she did not think that her knee surgery (the arthroscopy performed on Plaintiff's left

3    knee in December 2004, discussed above) had helped with the pain . *Id*.  She testified that she likely

4    was going to have to have total knee replacement surgery on her left knee and would learn for sure

5    whether the surgery would be necessary at an appointment scheduled for January 20, nine days after

6    the hearing.  AR at 380.  Plaintiff testified that she had first been told that this might be necessary in

7    December 2003.  *Id*.  Plaintiff stated that if her doctor advised her to get the surgery, she would

8    comply.  AR at 381.

9         Plaintiff testified that to address her breathing problems, she had to use a nebulizer four

10   times a day as well as take various medications; she also used a machine when at home to help with

11   her breathing.  AR at 382.  Plaintiff said that her breathing worsened upon exposure to extreme

12   temperatures, chemicals, and soaps.  AR at 385.  She testified that after walking about half a block,

13   Plaintiff had difficulty breathing.  AR at 386.  As for her wrists, Plaintiff stated that because of her

14   carpal tunnel syndrome she could only type for a few minutes at a time and generally just used the

15   mouse when on the computer.  AR at 386-87.

16        Next, Plaintiff's attorney questioned her about her daily activities.  AR at 388.  Plaintiff said

17   that due to pain and asthma, she could only sleep about four hours a night.  AR at 389.  Plaintiff

18   stated that she sometimes made meals for herself, and other times, because she could not stand for

19   very long and suffered from pain in her hands, her daughter would help her.  AR at 389, 391.

20   Plaintiff testified that she generally left the house only when necessary, such as for doctor

21   appointments or church.  AR at 390.  Plaintiff stated that to rest her knees, she spent about six hours

22   out of an eight-hour day lying down.  AR at 393.

23        The VE and the ALJ also asked Plaintiff several questions about her past work.  AR at 366,

24   393.  Plaintiff stated that when she worked as a receptionist, she sat for most of the day.  AR at 366.

25   Plaintiff said that she stopped working as a receptionist on January 31, 2004 because of knee

26   problems.  AR at 393.  Two falls, one in the workplace and one on the street, contributed to those

27   problems.  AR at 394.  Plaintiff's attorney confirmed that the past work Plaintiff performed were the

28

9

**United States District Court**
For the Northern District of California

1    jobs of receptionist, warehouse worker, and wire transfer clerk.  AR at 394-95.

2        The ALJ then presented the following hypothetical to the VE:

3        [A]ssume someone the claimant's age, education and experience, age 50, 54 at all relevant
         times in that category, assume the capacity for sedentary work that will permit alternating
4        sitting and standing for brief periods as needed approximately every 30 minutes. . . . No work
         at any heights. . . .With the non-dominant right, handlin[g] and fingering are limited to
5        frequent but not constant.  And forceful gripping and grasping are limited to occasional.  And
         also the individual must avoid concentrated exposure to chemical fumes, temperature
6        extremes, high humidity and smoke.

7    AR at 396.  The ALJ restricted the hypothetical to sedentary jobs.  AR at 421.  He went on to clarify

8    the hypothetical by stating, "So what I'm pos[i]ting in the hypothetical is the ability to stand briefly

9    for five minutes every 30 minutes, but nevertheless continue to perform work. . . ."  AR at  397-98.

10       Based on the ALJ's hypothetical, the VE testified that the Plaintiff would not be able to

11   perform the job of warehouse worker because the DOT classified it as a medium-exertional strength

12   job.  AR at 397.  The VE also concluded that Plaintiff would not be able to perform her receptionist

13   job as she had been doing it or as normally performed in the economy.  AR at 399-400.  The VE

14   testified that it would be difficult for Plaintiff to write down messages and answer the phone while

15   standing up.  AR at 402.  The VE stated that Plaintiff would not be able to perform the wire transfer

16   clerk job either because it involved using the computer, which would be difficult considering she

17   had to alternate between sitting and standing.  *Id.*  The VE concluded that Plaintiff could do the job

18   of an information clerk, and more specifically, mall information clerk, which had a Specific

19   Vocational Preparation ("SVP") of 3 or 4 sedentary.[2]  AR at 405.  He stated that an information clerk

20   at a mall would have to answer fewer phone calls, and so could likely alternate between sitting and

21   standing more easily. *Id.*   The VE testified that counting the number of malls in the Bay Area would

22   be one method to determine how many information clerk positions were available, as each mall

23   likely had one information clerk.  AR at 406.

24

25       [2]SVP refers to the amount of time required by the average worker to learn the techniques,
26   acquire the information, and develop the facility needed for average performance in a specific job.  An
     SVP of 3 requires over one month and up to and including three months of training.  An SVP of 4
27   requires over three months and up to and including six months of training.  *See Dictionary of
     Occupational Titles, Appendix C: Components of the Definition Trailer.*

28

**United States District Court**
For the Northern District of California

1    Next, Sackett questioned the VE, adding into the hypothetical a limitation specifically

2    prohibiting exposure to perfume and cologne.  AR at 412.  The VE concluded that it depended on

3    the person's level of sensitivity, but that it was not unlikely that customers would be wearing

4    perfume, which could trigger symptoms in the mall clerk when approached for help.  AR at 413.

5    Another issue raised was that big department stores often place their perfume displays near the store

6    entrance, which could create a problem if the mall in turn situates its information desk close to the

7    entrance of a department store.  AR at 415-16.  The VE also noted that an individual with a

8    limitation prohibiting exposure to the cold and humidity might not be able to work as a mall

9    information clerk because in some malls, the information clerk is required to sit very close to the

10    door.  AR at 412.  In the VE's opinion, most mall clerks are situated "closer to the front door."  AR

11    at 414.

12    **F.    The Supplemental Administrative Hearing**

13    On March 8, 2006, the ALJ held a supplemental administrative hearing.  AR at 421.

14    Plaintiff, her attorney, and the VE were again present at this hearing.  *Id*.  The second hearing was

15    held because the ALJ stated he should not have restricted his hypothetical in the previous hearing to

16    sedentary jobs; he stated that similar hypotheticals for jobs classified at the light level should also

17    have been addressed.  *Id*.  At the hearing, the ALJ questioned Plaintiff about the status of her knee

18    replacement surgery.  AR at 426.  Plaintiff responded that while the doctor had not yet scheduled a

19    specific date for the surgery, the surgery was to be performed within the month.  AR at 426-27.

20    The ALJ reviewed the hypothetical presented at the first hearing and then gave the VE a

21    second hypothetical, stating "[s]ame hypothetical I just review[ed] with you, but a capacity for light[3]

22    exertional work with the alternating sitting and standing as needed for up to 5 minutes

23    approximately every 30 minutes.  And obviously the lifting and carrying being at 10 and 20 pounds

24    at the light level."  AR at 423.  In response to the new hypothetical, the VE testified that one could

25    perform the jobs of security guard/lobby attendant, hostess, or cashier II, all three positions with a

26

27

28    [3] ". . .[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  *See* S.S.R. 83-10.

11

United States District Court

For the Northern District of California

1   SVP of 1 and 2.[4]  AR at 424.  He stated that there were 1,200 such security guard positions in the

2   Bay Area and 79,600 positions nationally, 356 hostess positions in the Bay Area and 16,073

3   nationally, and 11,300 cashier II positions in the Bay Area and 964,700 positions nationally.  AR at

4   423, 425, 427.  Sackett asked the ALJ the basis for the hypothetical and the ALJ replied that he

5   based the hypothetical on the internal medicine consultative evaluation by Dr. Momi and the DDS

6   consultant review by Dr. VanCompernolle; both doctors had stated that Plaintiff could stand five to

7   six hours in an eight-hour workday.  AR at 427-28.

8        Sackett then questioned the VE about the significance of a limitation limiting standing to five

9   or six hours out of eight, cited by the ALJ.  AR at 428.  Sackett concluded that this limitation

10  translated into a requirement that Plaintiff sit for fifteen to twenty minutes out of every hour in an

11  eight hour work day.  AR at 429-430.  Sackett then asked the VE to incorporate this limitation into

12  the ALJ's hypothetical.  AR at 430.  With this limitation added to the hypothetical, the VE testified

13  that Plaintiff would not be able to perform the hostess position, but could perform the remaining

14  positions of cashier II and lobby attendant/security guard.  AR at 434.

15       In regards to the security guard position, Sackett raised the issue that after September 11,

16  2001, security guards required more training, so the position would not qualify as an SVP 1 or 2.

17  AR at 430.  The VE stated that the security guard position still necessitated just a three hour open

18  book test with thirty questions, and that only the length of time required to obtain a permanent guard

19  card had changed.  AR at 431.  Plaintiff's counsel asked whether security job positions would be

20  available if an individual were precluded from walking around the perimeter of the building.  AR at

21  433.  In response, the VE said that this would reduce the number of positions available.  AR at 434.

22       Plaintiff's attorney then asked the VE to "assume the truth of what the claimant testified to at

23  the first hearing, that number one, she's using a cane, she has difficulty walking, for which she's

24  going to have knee surgery and therefore she's precluded from doing this sustained standing and

25  walking required of light work."  AR at 434.  He asked, "would that wipe out the [cashier, hostess

26  and lobby attendant] jobs?"  *Id*.  The VE responded it would.  *Id*.  Finally, the VE revised the number

27  

28       [4]An SVP of 1 requires only a short demonstration.  An SVP of 2 incorporates anything beyond
    a short demonstration up to and including one month of training.

1    of mall information clerk positions in the Bay Area down to fifty-nine.  AR at 437.

2        **G.    The ALJ's Five-Step Analysis and Findings of Fact**

3        Disability insurance benefits are available under the Social Security Act when an eligible

4    claimant is unable "to engage in any substantial gainful activity by reason of any medically

5    determinable physical or mental impairment . . . which has lasted or can be expected to last for a

6    continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

7    § 423(a)(1).  A claimant is only found to be disabled if his physical or mental impairments are of

8    such severity that he is not only unable to do his previous work, but also "cannot, considering his

9    age, education, and work experience, engage in any other kind of substantial gainful work which

10   exists in the national economy."  42 U.S.C. § 4239(d)(2)(A).  The claimant bears the burden of proof

11   in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

12   (1996).

13       The Commissioner has established a sequential five-part evaluation process to determine

14   whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step

15   One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."

16   20 C.F.R. § 1520(a)(4)(I).  If he is, the Commissioner finds that the claimant is not disabled, and the

17   evaluation ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner

18   proceeds to Step Two.

19       At Step Two, the Commissioner considers whether the claimant has "a severe medically

20   determinable physical or mental impairment," or combination of such impairments, which meets the

21   duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits

22   [the claimant's] physical or mental ability to do basic work activities."  C.F.R. § 404.1520(c).  In

23   addition, the physical or mental impairment (or combination of impairments) must have lasted, or

24   must be expected to last, for a continuous period of 12 months.  20 C.F.R. § 404.1520(a)(4)(ii); 20

25   C.F.R. § 404.1509.  If the claimant does not have a severe impairment for the required duration, the

26   Commissioner finds the claimant not disabled and the evaluation ends at this step.  C.F.R.

27   § 404.1520(c).  Age, education, and work experience are not considered at this step.  *Id.*

28       At Step Three, the Commissioner considers whether the claimant's impairment, or

United States District Court
For the Northern District of California

impairments, "meets or equals" one of the Social Security Administration's compiled listings of impairments that the Commissioner has established as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets one of these listed impairments, the Commissioner will find the claimant disabled. If the impairment does not meet one of the listed impairments, the process continues to Step Four.

At Step Four, the Commissioner considers whether the claimant, in light of his RFC, can continue to perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). Based on the relevant medical evidence and other evidence in the record, the Commissioner will assess the claimant's RFC to determine whether the claimant can do his past work. 20 C.F.R. § 404.125(e). If the RFC assessment determines that the claimant can perform his past work, the Commissioner will find him not disabled. 20 C.F.R. § 404.1520(f). If the RFC assessment determines that the claimant cannot perform his past work, then the claimant proceeds to Step Five of the evaluation.

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled. *Id*. At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy, and that such a job actually exists. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

Finally, a prior administrative finding of non-disability gives rise to a presumption of continuing non-disability that can only be overcome if the claimant proves "changed circumstances" indicating a more severe condition. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988).

The ALJ found at Step One of the evaluation process that Plaintiff had not engaged in any substantial gainful activity at any time since her disability onset date of January 31, 2004. AR at 17.

At Step Two, the ALJ found that the claimant's medically determinable severe impairments were sarcoidosis/asthma, obesity, mild degenerative joint disease in the bilateral knees, and mild right carpal tunnel syndrome. AR at 17.

14

1   At Step Three, the ALJ found that the medical evidence in the record did not contain
2   objective signs to establish that Plaintiff's impairments, either alone or in combination, met or
3   equaled the criteria of any impairment in the Listing of Impairments. AR at 18.

4   At Step Four, the ALJ found that Plaintiff has suffered from asthma for many years and that
5   her asthma had flared repeatedly. *Id*. He noted, however, that her asthma flares were due in part to
6   Plaintiff's noncompliance with treatment recommendations and the fact that her spouse and children
7   smoked in the house. AR at 19.

8   The ALJ further found that Plaintiff had suffered from bilateral knee pain for many years.
9   AR at 19. He noted that Plaintiff had received injections in her left knee and in December 2004 had
10  undergone a left knee arthroscopy. *Id*. He stated that the last treatment she had received was in July
11  2005, when she saw a doctor for knee pain and the doctor recommended conservative treatment with
12  Tylenol and anti-inflammatory medications. *Id*. The ALJ stated that Plaintiff had received no
13  subsequent treatment for her knee pain, *id.*, but acknowledged elsewhere in the decision that
14  Plaintiff was likely to undergo a total knee replacement. AR at 20. The ALJ concluded, however,
15  that the proposed knee replacement would not result in an inability to work for a continuous period
16  of twelve months. *Id*.

17  The ALJ accepted the opinion of state agency doctor Jaskaran Momi, finding that Plaintiff's
18  RFC was for a limited range of "light" work, that Plaintiff would be able to sit for six hours a day,
19  and to stand and/or walk for about forty minutes at a time for a total of five to six hours, and that she
20  would be able to lift and carry ten pounds frequently and twenty pounds occasionally. AR at 19-20.
21  The ALJ imposed the following restrictions on the non-dominant upper extremity: frequent but not
22  constant handling and fingering, and only occasional forceful gripping and grasping. AR at 20.
23  Furthermore, the ALJ found that Plaintiff must be allowed to alternate between sitting and standing
24  every fifteen to twenty minutes and that she must be allowed to sit for fifteen to twenty minutes each
25  hour. *Id*. The ALJ also precluded Plaintiff from performing work at heights and from climbing
26  ladders, rope, or scaffolding, and found that she must avoid concentrated exposure to chemical
27  fumes, temperature extremes, high humidity, and smoke. *Id*. The ALJ accepted the VE's testimony
28  that Plaintiff was unable to perform any of her past relevant work. AR at 21.

15

United States District Court
For the Northern District of California

1    At Step Five, the ALJ used the rules contained in the Medical-Vocational Guidelines of

2    Appendix 2 of subpart P of section 404 as a framework for his decision, and also relied upon the

3    testimony of the VE in support of his finding that Plaintiff was not disabled. *Id*  The ALJ found that

4    considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform two jobs:

5    Lobby Attendant and Cashier II.  AR at 21.  The ALJ further found that the two jobs existed in

6    significant numbers in the national economy. *Id*. The ALJ then concluded that Plaintiff was not

7    disabled at any time beginning January 31, 2004.  *Id*.

8        **H.     Contentions of Parties**

9    Plaintiff asserts that the ALJ's determination of her RFC at Step Four, and in particular the

10    finding that Plaintiff could stand and/or walk for five to six hours a day, as required to perform light

11    work, was not substantiated by the record when viewed in its entirety and that at best, Plaintiff could

12    perform sedentary work.

13    In addition, Plaintiff argues that the ALJ's hypothetical questions failed to incorporate all of

14    her medical limitations, and thus the VE's opinion, which was based on those questions, has no

15    evidentiary value.  *Id*. at 16.  In particular, Plaintiff states that the hypotheticals failed to take into

16    account her need for a total knee replacement surgery and her need to use a cane when walking.  *Id*.

17    Third, Plaintiff contends that there is no affirmative evidence of malingering in the present

18    case, and thus, the ALJ cannot reject Plaintiff's testimony regarding her knee problems without

19    providing clear and convincing reasons supported by substantial evidence in the record, which he

20    did not do.  *Id*. at 17-18.  Plaintiff argues that the ALJ's challenge to the credibility of her testimony

21    regarding her knee problems overlooks the fact that she must sit for periods of time while

22    performing her daily activities and that her symptom testimony cannot be reconciled with the ability

23    to work a forty-hour week.  *Id*. at 17, 19.

24    The Commissioner argues that the ALJ's conclusion that Plaintiff could perform light work

25    is supported by substantial evidence and in particular, the findings of Dr. Momi and the state agency

26    doctors.  The Commissioner further asserts that the ALJ properly considered Plaintiff's credibility at

27    Step Four and his assessment that Plaintiff was not fully credible was supported by clear and

28    convincing reasons based on substantial evidence.  *Id*. at 7, 10.  Third, Defendant asserts that the

ALJ properly relied on the VE's testimony to find that Plaintiff could perform work existing in the national economy. *Id.* at 11.

### III.     ANALYSIS

#### A.     Legal Standard

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind accepts as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere scintilla" but "less that a preponderance."  *Id.*  *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988).  Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

#### B.     ALJ's Determination of Plaintiff's Residual Functional Capacity

Plaintiff challenges the ALJ's RFC finding that she has the ability to stand and/or walk for five to six hours a day.  Having carefully reviewed the record, the Court concludes that substantial evidence supports the ALJ's RFC.

A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. § 404.1545(a).  An ALJ must base his determination of a claimant's RFC on all the relevant evidence in the record, including medical history, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *See* SSR 96-8p; 20 C.F.R. § 404.1545(a).  The ALJ should consider "those limitations for which there [is] record support that d[o] not depend on [claimant's] subjective complaints." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).  Unsupported limitations may be excluded.  *Id.* at 1218.  More weight must be given to the opinion of a treating physician than a non-treating physician, and more weight must be given to the opinion of an examining physician than a non-examining physician.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  An ALJ may reject the uncontroverted opinion of a

17

United States District Court

For the Northern District of California

1   treating physician only for clear and convincing reasons. *Id*. Where a non-treating physician

2   contradicts a treating physician based on independent clinical findings, it is the province of the ALJ

3   to resolve the conflict. *Id*. Finally, where the opinion of the non-treating physician contradicts that

4   of the treating physician and the non-treating physician relies on clinical findings that were also

5   considered by the

6   treating physician, the ALJ must offer specific legitimate reasons, based on substantial evidence, for

7   rejecting the opinion of the treating physician. *Id*.

8          In the present case, the ALJ relied on reports by treating physicians as well as the opinion of

9   one non-treating, examining physician, Dr. Momi in making his RFC determination. In his decision,

10  the ALJ throughly discussed reports by Plaintiff's treating physicians at Alameda County Medical

11  Center and Kaiser Permanente, which detailed Plaintiff's history of asthma and knee pain. Several

12  considerations are particularly of note: reports that Plaintiff's knee injections had  good results, X-

13  rays that showed Plaintiff had only mild degenerative joint disease in the knees, and an

14  approximately six to seven month gap in treatment after her knee arthroscopy. AR at 19. The ALJ

15  also relied on the state agency internal medicine evaluation performed by Dr. Momi; his finding that

16  Plaintiff could stand and/or walk for five to six hours a day was supported by Dr. Momi's evaluation

17  and functional assessment.

18         The Court concludes that the RFC was supported by substantial evidence.

19         **C.     The ALJ's Credibility Determination**

20         Plaintiff argues that the ALJ erred when he found that Plaintiff's claim that she could

21  perform no work was not entirely credible. In particular, Plaintiff argues that the ALJ improperly

22  relied on Plaintiff's daily activities as a basis for finding that Plaintiff's knee pain did not preclude

23  her from performing all work. The Court concludes that the ALJ did not err. Rather, the ALJ

24  provided clear and convincing reasons for his credibility determination, supported by substantial

25  evidence.

26         A claimant's credibility is the degree to which the claimant's statements can be believed and

27  accepted as true. SSR 96-7p at 4. The ALJ must make credibility findings to determine the truth of

28  a claimant's description of her symptoms and pain. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.

United States District Court

For the Northern District of California

1    1996) (holding ALJ responsible for determining credibility and resolving conflicts in medical

2    testimony).  When making such findings, the ALJ "must consider the entire case record and give

3    specific reasons for the weight given to the [claimant's] statements.  The reasons for the findings

4    must be grounded in the evidence and articulated in the determination or decision."  *Id.*  Testimony

5    cannot be discredited solely because it is not supported by objective medical evidence.  *See* SSR 96-

6    7p; *Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  Further, when there is no affirmative evidence

7    of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's

8    testimony.  *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) (citation omitted).

9         The Ninth Circuit has articulated several factors that can be considered in determining

10    whether a claimant's pain testimony is credible.  These include the claimant's "reputation for

11    truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his

12    daily activities, his work record, and testimony from physicians and third parties concerning the

13    nature, severity, and effect of the symptoms of which he complains."  *Light*, 119 F.3d at 792-93.  If a

14    claimant has proffered medical evidence that indicates the presence of an impairment that could

15    cause some pain, an ALJ may not base his disbelief of a claimant's testimony on the sole fact that it

16    is unsupported by medical findings.  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  The Ninth

17    Circuit's rationale for this rule lies in the fact that "pain is a subjective phenomenon."  *Id.*

18         Here, the ALJ gives six reasons in support of his credibility determination.  First, he cites to

19    Plaintiff's daily activities, which he describes as being "fairly full, including laundry, shopping,

20    cooking, and cleaning."  AR at 20.  Second, he notes that none of Plaintiff's examining doctors have

21    ever concluded that she could not work at all.  Third, he points to evidence that Plaintiff has not

22    complied strictly with her asthma medication regime and that when she has complied, her asthma

23    has been kept fairly under control.  Fourth, he notes that Plaintiff allows her husband and children to

24    smoke in the house despite her asthma.  Fifth, he finds that the medical evidence does not support

25    her claims of unusual chemical sensitivity or bilateral carpal tunnel syndrome (only right carpal

26    tunnel syndrome) or her need to use a nebulizer four times a day. Sixth, he concludes that while a

27    total knee replacement may prevent her from working for a time, nothing in the record suggests that

28    Plaintiff will not be able to work continuously for twelve months, as required to establish disability.

**United States District Court**
For the Northern District of California

1    As a threshold matter, the Court finds that in the instant case, the record does not contain

2    affirmative evidence of malingering, and therefore, the ALJ was required to offer clear and

3    convincing reasons for rejecting Plaintiff's testimony. The Court further finds that the ALJ provided

4    a clear and convincing basis to justify his adverse credibility finding.  First, the daily activities

5    described by Plaintiff appear to contradict her contention that she can perform no work at all.

6    Rather, they are consistent with the ALJ's finding that she can stand and walk for periods of time so

7    long as she can take 15 to 20 minute breaks each hour.  Second, the ALJ's reliance on the

8    failure of Plaintiff's examining doctors to find Plaintiff totally disabled is consistent with the

9    medical record.  In particular, Plaintiff's doctors generally recommended conservative treatment for

10   Plaintiff's knee pain throughout the period leading up to the hearing, even though Plaintiff was

11   scheduled for complete knee replacement surgery at the time of the hearing (a fact that the ALJ

12   acknowledged).  Third, the ALJ's citation to Plaintiff's failure to comply with her medication regime

13   and her tolerance of smoking in the house by other family members supports his credibility

14   determination.  *See Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).  Similarly, there is no medical

15   evidence in the record that supports Plaintiff's claim of *bilateral* carpal tunnel syndrome or unusual

16   chemical sensitivity.

17   The Court concludes that the ALJ offered clear and convincing reasons for his credibility

18   determination.

19   **D.    The ALJ's Hypothetical**

20   Plaintiff argues that the ALJ's hypothetical improperly left out the use of a cane to assist with

21   walking as well as the limitations associated with knee replacement surgery and particularly an

22   inability to stand and/or walk for a sustained period of time.  As a result, Plaintiff asserts, the

23   testimony of the VE upon which the ALJ relied at Step Five does not constitute substantial evidence

24   in support of the ALJ's conclusion that Plaintiff is not disabled.  The Court disagrees.

25   A hypothetical posed by the ALJ to the VE at Step Five must be based on medical

26   assumptions supported by substantial evidence in the record that reflects each of the claimant's

27   limitations.  *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ "is not free to

28   disregard properly supported limitations."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir.

20

United States District Court

For the Northern District of California

1   2006).  However, the ALJ does not have to follow a plaintiff's recommendations for what elements

2   should be included in the hypothetical.  *Magallanes*, 881 F.2d at 756-57.  The testimony of the VE,

3   in turn, is sufficient to support a finding that a claimant is or is not disabled only if it is in response

4   to a hypothetical that accurately reflects the plaintiff's RFC.  *Robbins*, 466 F.3d at 886.  If a court

5   finds the hypothetical to be inadequate because it fails to include all properly supported limitations,

6   it is not harmless error if the record suggests that it would have been determinative as to the VE's

7   recommendation to the ALJ.  *Andrews v. Shalala*, 53 F.3d 1035, 1043-44 (9th Cir. 1995).  On the

8   other hand, an ALJ's error may be harmless in a social security case "where the mistake was

9   nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion."  *Stout v.*

10  *Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

11          The Court finds that the ALJ did not err in failing to include a limitation based on evidence

12  that Plaintiff walked with a cane and was scheduled to undergo knee replacement.  As discussed

13  above, substantial evidence supports the ALJ's conclusion that Plaintiff could stand or walk for 5 to

14  6 hours out of an eight hour day, notwithstanding her use of a cane and her upcoming knee surgery.

15  As the ALJ's hypothetical included a limitation requiring breaks of 15 to 20 minutes per hour, the

16  Court concludes that it sufficiently reflected the limitations arising from Plaintiff's knee pain and

17  that the testimony offered by the VE in response constituted substantial evidence in support of the

18  ALJ's finding at Step Five that Plaintiff was not disabled.[5]

19

20

21

22

23          [5]In Plaintiff's Response, Plaintiff argues, for the first time, that an inconsistency exists between
    the VE's testimony and the definition of "light" work given by the *Dictionary of Occupational Titles*
    ("DOT") in connection with the Lobby Attendant and Cashier II positions.  In particular, the DOT states
24  that the positions of Lobby Attendant and Cashier II require a minimum of 6 hours a day of standing
    or walking, while the VE's testimony was based on an RFC "of approximately 5+ hours of standing."
25  Response at 2.  The Court rejects this argument for two reasons.  First, this argument should have been
    raised in Plaintiff's Motion, not in its reply brief.  Second, to the extent the RFC describes Plaintiff's
26  standing limitation in terms of a range of time she needs to sit each hour, the occupations cited by the
    VE fall within that range.  Therefore, the VE was not required to address the slight discrepancy that
27  would have arisen if Plaintiff's RFC required a *minimum* of 20 minutes of sitting each hour.  Further,
    the Court notes that the requirement that Plaintiff sit for 15 to 20 minutes each hour is supported by
28  substantial evidence, as discussed above.

21

**United States District Court**
For the Northern District of California

**IV.    CONCLUSION**

For the reasons stated above, Plaintiff's Motion is DENIED.  Defendant's Motion is GRANTED.  The decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: August 27, 2008

_____
JOSEPH C. SPERO
United States Magistrate Judge

22